## THE HARRY BROWN.

### THE BEAVER.

#### THE HARRY BROWN et al. v. MOREN et al.

(Circuit Court of Appeals, Third Circuit. October 15, 1894.)

No. 13.

ADMIRALTY—COLLISION BETWEEN TOWS IN MISSISSIPPI RIVER.

The steamers B. and H., each having in tow several coal barges, were proceeding down the Mississippi river. The B., which was ahead, tied up at S. landing, but lower down than, as claimed by the H., she should have done in pursuance of an agreement alleged to have been made between them. When the B. passed the point where the H. claimed she should have tied up, the H. was a mile or more further up the river, saw the B.'s movements, and had ample room to avoid her, but instead, followed the B.'s course so closely that, after the latter was tied up, the tows collided, and two barges of the B.'s tow and one of the H.'s were sunk. *Held* that, assuming the agreement as to the place for the B.'s tying up to be proved, the B.'s violation of it did not contribute to the collision, and that the H. alone was in fault.

Appeal from the District Court of the United States for the Western District of Pennsylvania.

This was a libel by John Moren and Michael Munhall, owners of two coal boats, against the steamer Harry Brown, for damages sustained in a collision. A petition was filed by Harry Brown and Samuel S. Brown, copartners trading as W. H. Brown Sons, claimants of the steamer Harry Brown, against the steamer Beaver, charging the latter with responsibility for damage to the coal boats and also to the steamer Harry Brown. The district court rendered a decree for libelants, apportioning the damages between the two steamers. The claimants of the steamer Harry Brown, and William J. Wood, Thomas J. Wood, Harry McDonald, and the Lysle Coal Company, claimants of the steamer Beaver, appeal.

George C. Burgwin, for the Harry Brown.

W. B. Rodgers, for the Beaver.

George C. Wilson, for appellees.

Before ACHESON and DALLAS, Circuit Judges, and BUTLER, District Judge.

BUTLER, District Judge. The suit is for damages resulting from a collision between tows of coal barges, in the Mississippi river, one of which was in charge of the Brown and the other of the Beaver. The district court having found the respondents jointly liable and decreed accordingly, each appealed, and assigned as error the failure to find and hold the other alone responsible.

There is no doubt of Moren's and Munhall's right to recover; the question is, who is responsible for the collision? The libel-ants supposed the Brown was, and accordingly attached her. She however, accused the Beaver with causing the accident, and had her summoned to answer not only for Moren's and Munhall's loss but also for loss suffered by herself—the Brown. The contest is therefore between the Brown and Beaver.

The district court found the former in fault for running too near the latter, and the latter in fault for failure to observe an agreement to "tie up" at a particular point in the river; which failure the court thought contributed to the collision.

We agree with the court in finding the Brown in fault. Was the Beaver also in fault? Assuming that the alleged agreement ex-isted, does it appear that the Beaver failed to observe it? In substance it was that she should "tie up" for the night as near the upper end of Sweet Home landing (which extends a considerable distance along the river) as was reasonably practicable and safe, in the existing state of the water. No exact point was named or could be. Its selection was necessarily left to the Beaver. She tied at the designated landing. But did she tie as high up as was practicable and safe? The witnesses disagree about it. Those called on her behalf say she did. Her pilot, who had experience with the landing, says he tied as high up as he could—as high as his boat and tow could get in, and find opportunity. It is difficult to see a motive to do otherwise. He had nothing to gain by going lower, and the further down he ran, the nearer he approached to swift water. If there was a proper place to tie three or four hun-dred yards higher up, as contended, it seems reasonable to believe the Brown would have tied there. She saw the Beaver go by, and was far enough away to provide for going in. There was no reason why she should go below the Beaver in pursuance of the alleged agreement, if the Beaver failed to observe it. Her pilot was unable to explain why she did not stop there, but suggested that darkness was approaching. There is nothing in this suggestion. It was as light for her as for the Beaver, and both "tied up" later, below. It seems therefore, impossible to say that the Beaver did not ob-serve the alleged agreement.

But granting she did not, her failure is of no consequence unless it contributed to the collision; and we are unable to see how it did. The Brown was not misled. There is no reason to believe her course would have been different if she had known from the be-ginning that the Beaver was going below, or that the collision would not have occurred if she had stopped above. She was more than a mile ahead in plain view, as the pilot and master of the Brown ad-mit. They saw her pass the point where they say she should have stopped. What excuse therefore have they for running into her? They could have stopped at this place if it was a suitable one, or if they preferred to go on could have run at a safe distance towards the other side. The channel was of ample width. The suggestion of an adverse current is unimportant; it did not exist at this point; and would afford no excuse if it did. It was their

duty to know the channel and its currents, and to govern their movements accordingly. Intending to pass the Beaver, they should have kept well over, especially in view of the unwieldy tows in charge; but instead of doing so they followed the Beaver's course so nearly, that when the danger became apparent it could not be escaped. They were then probably embarrassed by the adverse current, for which they should have provided higher up.

The decree of the district court must be reversed and a decree entered against the Harry Brown in favor of John Moren and Michael Munhall for $3,775.41 with interest from October 4, 1890, together with the costs in the district court, and of the several appeals.